BRIAN A. BENCZKOWSKI
Assistant Attorney General
United States Department of Justice, Criminal Division
AARON R. COOPER
TIMOTHY C. FLOWERS
Trial Attorneys
Computer Crime and Intellectual Property Section
Washington, DC 20530
Telephone (202) 514-1026

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 16-CR-00007-GEB |
| Plaintiff, | SENTENCING MEMORDANDUM OF THE UNITED STATES |
| v. | DATE: August 10, 2018 |
| SEYYED ALI NOORI, | TIME: 9:00 a.m. |
| | COURT: Hon. Garland E. Burrell, Jr. |
| Defendant. | |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The United States of America, by Brian A. Benczkowski, Assistant Attorney General, Criminal Division, U.S. Department of Justice, and Aaron R. Cooper and Timothy C. Flowers, Trial Attorneys, Computer Crime and Intellectual Property Section, respectfully submits its sentencing memorandum in the above-captioned case.  The United States agrees with the sentencing guidelines calculations set forth in the Presentence Investigation Report and

1

respectfully recommends that the Court impose a sentence of 12 months on the defendant, which falls at the bottom of his advisory guidelines range.

## I. THE PSR

The United States agrees with the factual statement set forth in the Presentence Investigation Report ("PSR"), Dkt. No. 34.  In addition, the United States agrees with the sentencing calculations set forth in the PSR.  Accordingly, as reflected in the PSR, if Noori is given a 3-point reduction for acceptance of responsibility, his Total Offense Level will be 13 and, with a Criminal History Category of I, the applicable U.S. Sentencing Guidelines range is 12–18 months in prison.

## II. PROCEDURAL BACKGROUND

On January 14, 2016, Defendant Seyyed Ali Noori ("Noori") was charged by indictment with two counts of trafficking in counterfeit sports apparel and accessories, in violation of 18 U.S.C. § 2320(a).  On March 30, 2018, Noori pleaded guilty to both counts of the indictment pursuant to a plea agreement, Dkt. No. 27.

## III. FACTUAL BACKGROUND

In his Plea Agreement, Noori admitted the following facts:

Noori was the sole owner and operator of Goldstar Wholesale, LLC ("Goldstar"), a regional wholesale distributor based in Tracy, California.  On or about August 13, 2013, Noori was in charge of a Goldstar retail location at Space J41-45 of the Galt Flea Market in Galt, California, within the Eastern District of California, where he sold goods bearing counterfeit trademarks.  On that date, Noori's employee sold to an undercover law enforcement officer (UC 1) a hat, flask and pair of sunglasses bearing counterfeit Oakland Raiders, San Francisco 49ers, and San Francisco Giants trademarks.  While Noori's employee conducted the transaction with

UC 1, Noori was present at the retail space and was in control of its operation.  UC 1 paid $30.00 for the property.

On or about October 22, 2013, at the same location, UC 1 purchased directly from Noori property including caps, shirts, and sunglasses bearing counterfeit NFL, MLB, and Monster trademarks.  UC 1 paid $120.00 for the merchandise.

On or about November 1, 2013, UC 1 and another undercover law enforcement officer (UC 2) met Noori at a warehouse controlled by Noori at 503 West Larch Road, Units G & I, in Tracy, California, within the Eastern District of California.  The officers purchased directly from Noori merchandise that included caps, knit headwear, flasks, sunglasses, knives, and watches bearing counterfeit Nike, Fox Head, National Football League, Major League Baseball, National Hockey League, John Deere, Monster Energy, and Hello Kitty trademarks.  The officers paid $400.00 for the property.

On or about November 12, 2013, at the Galt Flea Market, an investigator with the Brand Security Corporation, in the presence of undercover law enforcement officers, purchased directly from Noori property that included caps and sunglasses bearing counterfeit Fox Racing and Monster Energy trademarks.  The investigator paid $64.00 for the merchandise.  The investigator employed by the Brand Security Corporation then served Noori with a notice directing him to cease and desist selling goods bearing counterfeit NFL, MLB, NBA, NHL, and Monster trademarks.  The investigator further identified counterfeit products on display for Noorit and explained to him how to identify counterfeit products.  Noori signed a declaration that he understood his rights and responsibilities under the cease-and-desist notice and would refrain from selling such products in the future.

On or about December 3, 2013, UC 1 discussed with Noori the possibility of purchasing

additional counterfeit trademarked goods. Noori stated that he had been advised that selling such goods was illegal and that that he was no longer displaying such goods for sale. Noori then handed the officer a bag and directed him to retrieve product from the rear of a truck labeled "Goldstar Wholesale." In the truck, UC 1 observed goods similar to those he had previously purchased from Noori, and observed another customer purchasing such goods. UC 1 purchased caps, knit hats and sunglasses bearing counterfeit MLB and NFL trademarks. UC 1 paid $74.00 for the merchandise.

On or about December 19, 2013, a state search warrant was executed at the Goldstar warehouse at 503 West Larch Road, Units G & I, in Tracy, California, a business operated by Noori. Noori and two employees were present. Thousands of items, including hats, shirts, and accessories, bearing counterfeit trademarks of the University of Oregon, Fox Racing, Monster Energy, MLB teams, NBA teams, NFL teams, NHL teams, New Era, and Nike, were openly displayed for sale and seized. The counterfeit items seized from the warehouse had a street sale value of greater than $95,000 but less than $150,000. Noori admitted that he had continued to sell such items after receiving the cease-and-desist notice.

**IV. SENTENCING POSITION**

As noted, the government agrees with the facts and Guidelines calculations set forth in the PSR, which yield a range of 12-to-18 months of imprisonment. In determining an appropriate sentence, 18 U.S.C. § 3553 requires a Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," and "the need to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). Based on the factors outlined in 3553(a), the government recommends a sentence of

12 months, which is sufficient but not greater than necessary to accomplish the purposes of sentencing, as discussed below.

First, criminal trademark offenses are not victimless crimes. Noori's victims have lost potential sales and seen the quality of their products and brands diluted by Noori's counterfeit trafficking activity. *See* Exhibit A (Victim Impact Statements) at 1. This effectively amounts to corporate identity theft – Noori capitalized on his victims' goodwill, hard-earned reputations, advertising expenses, and development costs to make money. *See* H.R. Rep. No. 109-68, at 8 n.2 (2005) ("Congress was concerned . . . that counterfeiters can earn enormous profits by capitalizing on the reputation, development costs and advertising efforts of honest manufacturers at little expense to themselves.") (alterations in original and internal quotation marks omitted) (legislative history to Stop Counterfeiting in Manufactured Goods Act, Pub. L. no. 109-181, §1, 120 Stat. 285 (2006)). Trademark infringement of this sort undermines the important intellectual property framework designed by Congress to foster the innovation and creativity that fuels the U.S. economy and American well-being. *See* S. Rep. No. 98-526, at 5 (1984), reprinted in 1984 U.S.C.C.A.N. 3627, 3631 ("To help stem . . . an 'epidemic' of commercial counterfeiting . . . , S. 875 provides for stiff criminal penalties for those who intentionally traffic in goods or services knowing them to be counterfeit.") (cited by *United States v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997)). Meaningful criminal enforcement of IP laws is essential to preserving that framework and ensuring that hard work and investments by American businesses and citizens are protected.

Second, the defendant was not a minor player in the counterfeit trafficking world. To the contrary, he was a regional distributor of wholesale quantities of counterfeit goods. As such, his business significantly facilitated the widespread sale of counterfeit products by other retailers

within and outside of the Sacramento area.  Noori was, in effect, the lynchpin connecting the manufacture of these illegal goods to the retailers who sold the products to consumers.  As the investigation revealed, the Goldstar warehouse housed thousands of counterfeit items, which the defendant admitted he had been trafficking for months.  The investigation further illustrated that Noori would have continued this activity unabated had it not been for timely and escalating intervention by law enforcement agents.

Indeed, perhaps most significantly, the defendant surely knew and was later explicitly warned that selling these counterfeit products violated the law.  He admitted that he purchased the goods well below market value at a suspect retailer in Los Angeles; there were no legitimate licensing tags or other markings on the products; and he paid in cash but said he had no receipts (although investigators did eventually find invoices and receipts during their search).  These factors alone were sufficient to put him on notice of the goods' infringing nature, but he sold them nonetheless.  Months later, after he received express warnings from a victim representative that his goods were illegal to sell, Noori again refused to stop.  Instead, he kept the contraband hidden from view and available for sale in his box truck and at the warehouse.  Notably, he did not try to return the infringing goods to his vendor or get his money back.

Noori had multiple chances to decide whether to follow the law or break it, from the first time he procured contraband from his supplier until after he received a cease-and-desist notice.  But he chose to break the law, and now he should live with the consequences of those choices: a sentence within his Guidelines range that includes a period of incarceration.  Prison time provides an important deterrence to both the defendant and other would-be traffickers.  This is especially important because, in this case, the defendant will likely return to his business after leaving prison and be in a position where he must choose whether to pursue legal or illegal

business opportunities.  He should receive a sentence that resonates with him, to ensure that he makes the right choice for himself, his family, and his victims and abides by the law.

To be sure, Noori has admitted his illegal conduct and this appears to be his first felony conviction.  The government therefore submits that a sentence of twelve months, at the low end of the Guidelines range, is appropriate.  Such a sentence would also permit Noori to serve half of the period of incarceration in an alternative form, although the government does not take a specific position as to the manner in which the defendant's sentence should be served.  Anything lower than a Guidelines sentence (such as the sentence of probation requested by the defendant), however, would rob this conviction of its potential deterrent value and signal to the defendant and others that intentionally breaking the law for financial gain may be worth the risk.  For all of these reasons, the government submits that a 12-month sentence, at the low end of the Guidelines range, is reasonable and no greater than necessary to accomplish the purposes of sentencing in this case.

## V. RESTITUTION

Restitution in this case is mandatory under 18 U.S.C. § 2323(c) and as an offense against property under the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A(c)(1)(A)(ii).  The government has received Victim Impact Statements and requests for restitution from the Brand Security Corporation (BSC) in the amount of $132,687.02, representing requests by Coalition to Advance the Protection of Sports logos (CAPS), New Era Cap. Co., Monster Energy Co., Nike, Inc., and Warner Bros., as well as for investigative costs of $20,077.33.  *See* Exhibits A (Victim Impact Statements) and B (Investigative Costs).  Separately, the PSR recommends that the defendant pay restitution to his victims in the total amount of $82,959.98, representing requests by BSC, CAPS, New Era Cap. Co., Monster Energy Co., Nike, Inc., and Warner Bros.

PSR ¶ 14. These requests were provided to Probation on behalf of the victims by BSC.[1] *Id.* The defendant has objected only to the inclusion of restitution for lost sales and lost royalty fees based on Noori's unsold products. *See* Dkt. No. 35 at 6.

There are two categories of applicable restitution in this case. First, for an offense against property, the MVRA requires that the defendant compensate his victims for the value of any loss or damage to their property. *See* 18 U.S.C. § 3663A(b)(1)(B). Here, the victims have identified several kinds of loss and damage, including foregone royalties from diverted licensing; lost sales; and damage to goodwill and reputation. *See, e.g.*, Exhibit A at 4 (CAPS Victim Impact Statement); *id.* at 16 (New Era Victim Impact Statement); *id.* at 17–18 (Monster Victim Impact Statement); *id.* at 19–20 (Nike Victim Impact Statement). Specifically, CAPS has requested restitution of for lost royalties and loss of reputation and goodwill in the amount of $40,460.25; Monster Energy has requested restitution for lost sales in the amount of $2,001; and New Era has requested restitution for lost sales in the amount of $80,728.75.

As to lost sales, courts have found that restitution is determined by "the actual amount [of infringing goods] placed into commerce and sold." *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006). Following this reasoning, *potential* lost sales for infringing items not actually sold should not be included. *See id.* at 107–108. The defendant takes this same position in his sentencing memorandum. *See* Dkt. 35 at 6. As to potential *future* sales, the government agrees that such losses are not compensable. *See United States v. Brock-Davis*, 504 F.3d 991, 1002 (9th Cir. 2007) ("Lost revenue is a consequential damage and is excluded from restitution . . . ."). Nonetheless, the investigation showed and the defendant admitted that he had been trafficking in counterfeit goods for several months prior to the search of his warehouse. But while these past

---

[1] Due to the discrepancy between the figures received by the government and those received by Probation, the government has contacted BSC for clarification and is currently awaiting a response.

sales indisputably caused loss to his victims, that loss cannot be readily determined given the defendant's record-keeping practices.

Irrespective of lost sales, his victims are entitled to restitution for lost royalties based on Noori's acquisition of the unlicensed products. This is because his victims would have received royalties had Noori obtained authentic, licensed goods from an authorized manufacturer. Unlike a future lost sales figure, which is based on unsold goods, the royalties figure for products in Noori's warehouse is based on actual purchases by Noori from unlicensed manufacturers and is therefore compensable. This accords with the purpose of restitution, which is to "make victims of crime whole." *Brock-Davis*, 504 F.3d at 998 (quotation omitted).

Second, the MVRA requires restitution to victims for "expenses incurred during participation in the investigation and prosecution" of the case. 18 U.S.C. § 3663A(b)(4). Here, the victims should be compensated for their assistance to law enforcement in investigating Noori's counterfeit trafficking in the Sacramento area, including by verifying that Noori's products were counterfeit, serving the cease and desist letter, and participating in the search to tabulate the amount of infringing product. In addition, the victims have paid for storage fees for the counterfeit product during the pendency of this case, and expect to bear costs for destruction of the contraband at the conclusion of this case. The victims have reported expenses of $20,077.33 for these expenses, *see* Exhibit B at 1, which the defendant should compensate them for under the MVRA.

**VI. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 12 months, a period of supervised release, and order the defendant to pay restitution for the full amount of his victims' compensable losses.

|   |   |
|---|---|
|   | Respectfully Submitted, |
| Dated: August 3, 2018 | BRIAN A. BENCZKOWSKI<br>Assistant Attorney General |
|   | By:    /s/<br>AARON R. COOPER<br>TIMOTHY C. FLOWERS<br>Trial Attorneys |